## THE MONDEGO.

### MONTGOMERY v. FURNESS.

(District Court, D. Maryland. May 6, 1893.)

SHIPPING—DAMAGE TO CARGO—CATTLE SHIP — DEFECTIVE VENTILATION—EVIDENCE.

The mere fact that a very unusual number of cattle died while in transit to Europe, from no apparent cause, is not of itself sufficient proof of defective ventilation, as against the fact that the ship was provided with so many air spaces as to lead all the inspectors and experts to pronounce the ventilation sufficient, and the further fact that both before and after the voyage she had carried a greater number of cattle with scarcely any mortality.

In Admiralty. Libel in personam by Lewis E. Montgomery against Christopher Furness to recover damages for loss of cattle while in transit to Europe. Libel dismissed.

Sebastian Brown, for libelant.

John H. Thomas, for respondent.

MORRIS, District Judge. This is a libel in personam to recover the value of 118 head of cattle which died on the voyage while being transported from Baltimore to London on the British steamer Mondego. The steamer was put on as one of the Furness Line, and under the usual special live-stock contract took on board for the libelant 495 head of cattle, 184 of which were on the upper deck, and 311 were in the between decks. The steamship sailed from Baltimore on November 22, 1889, and arrived at London on December 9th. The passage was smooth, with light warm winds from abaft the ship. There was very unusual mortality among the cattle, 114 dying in the between decks and 4 on the upper deck. Those which were landed were in fair condition, except, perhaps, a little shrinkage in weight.

The question of fact in issue is as to the ventilation of the between decks. The libel charges that the cattle died from want of sufficient ventilation for so large a number as 311 head of cattle in the between decks. The defense on behalf of the ship is that the ventilation was sufficient, and had been proved ample by the vessel carrying a larger number of cattle on a previous voyage at a warmer season of the year, and that these cattle died either from inherent disease, or from being overheated and wet when put aboard, or from neglect of the cattle men in not attending to them on the voyage, or because they were very fat and swill fed, which rendered them risky to carry.

The Mondego was not specially constructed with reference to the cattle-carrying trade. She had been a passenger steamer, and was altered into a freighter, but she had, when her hatches were not closed, an unusual amount of open hatch space; and the ventilation of her between decks was such as to induce all the regular underwriters' inspectors, and the official inspector of the board of agriculture of England, who inspected her after this voyage,

and with knowledge of the loss of cattle, and of the complaint made against her by the libelant, to certify that she was properly ventilated to carry cattle between decks. The steamship had just made a voyage, sailing from Montreal on October 2, 1889, for Liverpool, and had carried 326 cattle between decks, and a large number of cattle and sheep on the upper deck, and lost only one. She afterwards, in August, 1890, carried from Montreal to London 306 cattle between decks, with a large cargo of cattle and sheep on her upper decks, with no loss. The Montreal cattle were smaller and more hardy than libelant's cattle, but in the voyage just previous to this voyage when libelant's cattle were carried, there were 25 more of them in the between decks. She had the same number of openings into the between decks as she had when she carried passengers. She had a small fore hatch and a very large main hatch forward. Her after hatch was of good size, and there was aft also a large companion way and two large skylights, which had ventilated the passengers' state-rooms and dining saloon; and besides these she had in different parts of her deck three bell ventilators, a grating, two booby hatches, and several other air spaces opening into the between decks for ventilation. In the large hatches, fore and aft, she had four turret ventilators, built up eight feet above the upper deck, and divided by cross sections extending above the turrets. There were thirty port holes, some of which were opened when there was no rough sea.

The passage was calm, and the hatches were never closed. Wind sails were put up to force the air down the hatches. The weather was warm, with light westerly winds following the ship. One of the animals died the first night they were on shipboard, and the deaths increased until the voyage was half over, when they decreased, but still continued to the end. With so many dead and dying animals in the between decks, with the labor entailed by the necessity for their removal, with the weather warm and the wind astern, we might naturally expect statements that the between decks were warm and close, no matter what might have been the cause of the deaths.

Undoubtedly the general rule is that the shipowner guaranties a seaworthy vessel, suitable to carry the particular cargo in such weather as may be expected; but in respect to live-stock contracts similar to this the most that can be required with regard to the ventilation is that it shall be such as is usual, and such as experience has demonstrated to be sufficient. Numbers of witnesses for the respondent testify that the means of ventilating the between decks of the Mondego were in excess of that in most similar cattle-carrying ships. She had no bulkheads, and there was a clear sweep on both sides of the engine and boiler spaces connecting the forward and after parts of the ship, which should have aided the ventilation. She was not expressly built for cattle carrying, and was of less width, in proportion to her length, than the more recent types of cattle steamers; but this was known to the libelant when

he engaged freight room for his cattle on her, and he endeavored on that ground to obtain some concession in the rate of freight.

The testimony of the cattle men is not very persuasive. They testify very generally, and give meager details of the condition of the cattle, and the apparent causes of their dying. The libelant, although on board during the voyage, and in charge of his own cattle, was not examined, having been, as was stated, prevented from attending the hearing. Some of the libelant's witnesses state that the cattle were unusually large and fat, and required a foot more width of space than average cattle, and that this crowding contributed to their injury. But this alleged deficiency of space is not a matter for which the ship can be held in fault. The fittings are proved to have been properly put up, and given the space uniformly allowed for cattle, viz. four animals to ten feet, an average of two feet six inches to each. The agents of the ship were obliged to have the fittings ready in anticipation of the arrival of the cattle, and there is no proof that they had any notice that unusually wide spaces would be required. The libelant, when he examined the ship and the fittings before the cattle went aboard, expressed no dissatisfaction.

The officers of the ship and other witnesses for the respondent entirely deny any insufficiency of the ventilation. They claim that the cattle men neglected the animals, and failed to feed and water them properly; that the ship had to wait two days for the arrival of cattle, and they came aboard in a rain, very hot, steaming, and exhausted; that they were very fat, apparently swill fed, and consequently delicate; that, on the voyage, the libelant, finding they were not doing well, took them out of their pens, and got them in disorder, and made their condition worse, by their falling and lying one on top of another. I am not disposed to accord to the officers of the ship entire candor in some of their testimony, but, after a careful consideration of all the testimony, the result is that I am not satisfied that the neglect of the ship is made out, unless the insufficiency of ventilation is to be presumed from the fact of the death of the cattle on the voyage. In this case the proof shows the number of air spaces was such as to lead all the inspectors and all the professional experts constantly engaged in dealing with such cargoes to say that the ventilation provided was sufficient, and the ship had actually carried safely a larger number of cattle between decks on the previous voyage, and in a warmer month; and it seems to me that under such circumstances the proof that the death of the cattle has resulted from want of ventilation should be convincing in order to justify the court in holding the ship liable, when there are other causes to which the loss might be attributed.

I do not find the allegation of unseaworthiness of the vessel established, and therefore dismiss the libel, without discussing the validity of the exemptions in the bill of lading, or the question of the liability of the respondent, who claims to have been merely the agent of the owners of the steamship, and not individually liable.